# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GERJUAN TYUS,
    Plaintiff,

    v.

ROGER NEWTON, *et al.*,
    Defendants.

No. 3:13-cv-01486 (SRU)

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, GerJuan Tyus, is currently incarcerated at Garner Correctional Institution in Newtown, Connecticut.  In October 2013, Tyus filed the present case in this court against defendants the City of New London; the County of New London; the City of New London Police Department; Chief Margaret Ackley, Lieutenants Brian Wright and Todd Bergeson, Sergeants Kristy Christina and Kevin McBride, and Officers Todd Lynch, Jeremy Zelinski, Timothy Henderson, Mikhail Liachenko, Trisha Marcaccio, Joseph Pelchat, Melissa Schafranski, Darrin O'Mara, Kyle Lamontagne, and Roger Newton of the City of New London Police Department; and Special Agents Kurt Wheeler, Scott Riordan, Robert Harrison, Dennis Turman, and Guy Thomas of the federal Bureau of Alcohol, Tobacco and Firearms (ATF).  Around the same time, Tyus filed a complaint arising out of the same conduct in Connecticut Superior Court, which the defendants removed to this court on November 19, 2013.  *See Tyus v. City of New London*, No. 3:13-cv-01726, Pet. Removal, Doc. No. 1.

On January 6, 2014, I granted a motion to consolidate the instant case with the action that had been removed by the defendants.  *See Tyus v. City of New London*, No. 3:13-cv-01486, Notice of Consolidation, Doc. No. 14.  The instant case is the lead case.  The member case—the former state court case—has been closed.  *See Tyus v. City of New London*, No. 3:13-cv-01726.

On April 29, 2014, I issued an order addressing Tyus's motion for leave to amend, Doc. No. 29, and a motion to dismiss filed by defendants the City of New London; the City of New London Police Department; and Chief Ackley, Lieutenants Wright and Bergeson, Sergeants Christina and McBride, and Officers Lynch, Zelinski, Henderson, Liachenko, Marcaccio, Pelchat, Schafranski, O'Mara, and Lamontagne of the City of New London Police Department, Doc. No. 15.[1]  In the order, I granted Tyus leave to file an amended complaint,[2] denied the motion to dismiss without prejudice, and dismissed pursuant to 28 U.S.C. § 1915A(b)(1) all claims in Count I of the Amended Complaint, as well as the Sixth Amendment claims and all conspiracy claims in Count V of the Amended Complaint.  Order, Doc. No. 35.

In June 2014, all the City of New London defendants (except Officer Newton) moved to dismiss claims set forth in the amended complaint.  Mot. Dismiss, Doc. No. 39.  On March 31, 2015, I granted the motion in part and denied it in part.  I dismissed (i) all claims against Officers Zelinski and Liachenko; (ii) all federal claims against Chief Ackley in her individual and official capacities; (iii) the claim that Officers Newton, Lynch, Pelchat, and Marcaccio falsely arrested Tyus on March 3, 2011; (iv) the claims under article I, sections 7 and 9 of the Connecticut Constitution against Chief Ackley and the City of New London; (v) the state law claims of negligence and intentional and negligent infliction of emotional distress against all defendants; and (vi) the claims under article I, section 10 of the Connecticut Constitution against all defendants.  I denied the motion to dismiss in all other respects.  Order, Doc. No. 84.

---

[1] Neither the County of New London, nor Officer Roger Newton joined in the motion to dismiss. Officer Newton resigned from the New London Police Department effective February 10, 2012. *See* Ex. P to Pl.'s Mem. Opp. Defs.' Mot. Dismiss, Doc. No. 78-1.

[2] The amended complaint includes the same defendants as were named in the complaint, except the County of New London and the City of New London Police Department, which were dropped as defendants.

On September 10, 2015, I issued an order addressing a motion to dismiss filed by ATF

Agents Wheeler, Riordan, Harrison, Turman, and Thomas (the federal defendants).  *See* Mot.

Dismiss, Doc. No. 67.  I dismissed all claims against those defendants pursuant to (a) 28 U.S.C.

§ 1915(e)(2)(B)(ii) (for all claims against Agent Harrison and the equal protection claim against

Agents Riordan, Wheeler, Turman, and Thomas); (b) Federal Rule of Civil Procedure 12(b)(1)

(for all federal claims for monetary damages and declaratory and injunctive relief against Agents

Wheeler, Riordan, Turman, and Thomas in their official capacities, as well as for all state law

claims); and (c) Federal Rule of Civil Procedure 12(b)(6) (for the Fourteenth Amendment due

process claims and the Fourth Amendment false arrest and malicious prosecution claims against

Agents Riordan, Wheeler, Turman, and Thomas, as well as for the claims that Agents Riordan

and Wheeler transported Tyus to federal court).  Order, Doc. No. 92.  Because all claims against

the federal defendants had been dismissed, I terminated those defendants from the case.  *See id.*

The case proceeds against the remaining defendants on (1) the Fourth Amendment search

and seizure and excessive force claims; (2) the Fifth and Fourteenth Amendment due process

claims; (3) the Fourteenth Amendment equal protection claim and the state law claims of assault

and battery against Lieutenants Wright and Bergeson, Sergeants Christina and McBride, and

Officers Lynch, Henderson, Marcaccio, Pelchat, Schafranski, O'Mara, Lamontagne, and Newton

in their individual and official capacities; (4) the claims under article I, sections 7 and 9 of the

Connecticut Constitution against Lieutenants Wright and Bergeson, Sergeants Christina and

McBride, and Officers Lynch, Henderson, Marcaccio, Pelchat, Schafranski, O'Mara,

Lamontagne, and Newton in their individual capacities; and (5) the Fourth and Fourteenth

Amendment claims against the City of New London.

Lieutenants Wright and Bergeson, Sergeants Christina and McBride, Officers Lynch, Henderson, Marcaccio, Pelchat, Schafranski, O'Mara, and Lamontagne, and the City of New London (collectively, the New London defendants) have filed a motion for summary judgment. Doc. No. 97.  Officer Newton has filed a separate motion for summary judgment.  Doc. No. 96. For the reasons set forth below, I deny the motions in part and grant them in part.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat properly supported motion for summary judgment).  When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party, and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon mere allegations or denials, but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine issue of material fact," there must be contested evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he bears the burden of proof, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such circumstances, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may be awarded. *Celotex*, 477 U.S. at 323.

Where one party is proceeding *pro se*, I must read the *pro se* party's papers liberally and interpret them "to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Despite this liberal

5

interpretation, however, "[u]nsupported allegations do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## II.    Facts[3]

Construed in the light most favorable to Tyus, *see Anderson*, 477 U.S. at 255, the facts are as follows.  In October 2010, a jury empaneled in this court acquitted Tyus of all federal criminal charges stemming from an arrest that occurred in November 2009.  *See United States v. Muller*, No. 3:09-cr-00247 (RNC), Judgment of Acquittal after Jury Trial, Doc. No. 494.  After his release from custody, Tyus returned to New London, Connecticut.

On January 18, 2011, Officers Henderson and Lamontagne pulled Tyus over for a traffic violation.  The officers issued Tyus a warning ticket for having a defective rear marker plate light.  Tyus asserts that his rear marker plate light was fully functional at the time of the stop.

---

[3] The relevant facts are taken from the Local Rule 56(a)1 Statements and Exhibits attached to the Local Rule 56(a)1 Statements filed by the New London defendants, Docs. Nos. 96-2–96-9, and Defendant Newton, Docs. Nos. 97-2–97-26, as well as Tyus's Affidavits, Docs. Nos. 103-1 & 109, and Exhibits attached to the Affidavits, Docs. Nos. 103-2 & 109.  Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a specific citation to an affidavit or other admissible evidence.  In addition, the opposing party must submit a list of disputed factual issues.  *See* D. Conn. Local R. Civ. P. 56(a)2 & 56(a)3.

With their motion for summary judgment, defendants filed a Notice to Pro Se Litigant, Docs. Nos. 96-3, 97-3, informing Tyus of his obligation to respond to the motions for summary judgment, the time limit for filing his responses, and of the contents of a proper response.  Tyus has failed to file a Local Rule 56(a)2 Statement in response to either motion for summary judgment.  Accordingly, defendants' facts, which are asserted in their Local Rule 56(a) 1 Statements and that have evidentiary support, are deemed admitted.  *See* D. Conn. Local R. Civ. P. 56(a)1 ("All material facts set forth in . . . [the Local Rule 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a)2.").

On January 22, 2011, Officers Henderson and Newton stopped Tyus because his vehicle had no front marker plate.  Tyus—who was accompanied by a passenger, Lashawn Cecil—contends that his vehicle did, in fact, have a front marker plate at the time of the stop.  During the stop, Officer Newton claimed to smell the odor of marijuana in Tyus's car, and asked him to exit the vehicle.  (At some point before the officers pulled Tyus over, he had been smoking marijuana in the car.)  Officer Newton then searched Tyus.  Although the officer did not find any narcotics or other contraband during the search, he did discover a knife in one of Tyus's pant pockets.  Officer Newton issued Tyus a traffic ticket for failure to display a front marker plate, but did not charge or arrest him for possession of a weapon.

Meanwhile, Officer Henderson observed Tyus's passenger, Cecil, moving his hands in a manner that suggested he was trying to conceal something.  Officer Henderson ordered Cecil to step out of the vehicle, and Officer Newton conducted a search of Cecil's person.  In the course of the search, Officer Newton patted over an object in the front of Cecil's pants.  Cecil admitted that the object was marijuana and removed the bag himself.  The officers searched Tyus's car for further contraband, but did not find any.  They then placed Cecil under arrest on charges of possession of marijuana and transported him to the New London police station.

Later that day, Officer Henderson prepared an incident report regarding the stop and search of Tyus and his car, and the search and arrest of Cecil.  Sergeant McBride verified the report.  Tyus later attempted to challenge the traffic violation, but a clerk at the Norwich Superior Court informed him that there was no traffic violation on record.

Two weeks later, on February 5, 2011, Officer Newton pulled Tyus over on Garfield Avenue in New London for failing to display a front marker plate, having tinted car windows,

7

and traveling too fast given the road and weather conditions.  Tyus, who was driving the vehicle, was accompanied by a woman in the front passenger seat.  Just after Officer Newton pulled over Tyus, Officer Marcaccio arrived at the scene.  After conversing with Tyus through the driver's side window, Officer Newton asked Tyus to exit the vehicle.  Tyus rose to get out of his car, and a knife—which Tyus identified as his own—fell out of his pocket onto the front seat.

Officer Newton then conducted a manual search of Tyus as Tyus stood facing his car on the driver's side.  During the search, Officer Newton repeatedly reached into the pockets of Tyus's pants and grabbed under Tyus's buttocks and crotch area.  The officer did not find any other weapons, but discovered cash in Tyus's pockets and claimed to have felt a non-anatomical object in his buttocks area.  Officer Marcaccio stood nearby and observed the entire search.

After the search was complete, Officer Newton escorted Tyus to the back of the vehicle, but did not handcuff him or retrieve the knife from the front seat.  He used his cell phone to make a call while Officer Marcaccio stood by Tyus.  Approximately five minutes after completing the manual search of Tyus—by which time Officer Pelchat also had arrived at the scene—Officer Newton went to the front seat of the car and obtained Tyus's knife.

While Officer Newton returned to Tyus's position at the back of the car, Officers Marcaccio and Pelchat went to the other side of the vehicle and spoke to Tyus's passenger.  They asked the woman to exit the vehicle and conducted a pat search with her consent.  After the search, the officers did not arrest the passenger and permitted her to return to the vehicle.

Approximately fifteen minutes after Tyus was pulled over, Officer Lynch arrived at the scene.  He spoke first with Tyus and then with Officer Newton.  At that point, Officer Newton placed Tyus in handcuffs, and Officer Lynch conducted two brief manual pat searches of Tyus's

8

buttocks area on the outside of his clothes while Officers Marcaccio, Newton, and Pelchat looked on.  After those searches, Officers Newton and Lynch escorted Tyus to Officer Marcaccio's police vehicle and placed him inside.  Officer Newton then arrested Tyus on charges of carrying a dangerous weapon and possession of a weapon in a motor vehicle.

Officers Marcaccio and Pelchat transported Tyus to the New London Police station, where Officer Pelchat issued Tyus a traffic ticket for failing to display a front marker plate, operating a vehicle with tinted windows without a permit, and traveling too fast given the weather conditions.  (When Tyus later attempted to challenge the traffic violations, a clerk in the Connecticut Superior Court informed him that there were no such traffic violations on record.)  During booking at the station, Officers Lynch and Newton again pat-searched Tyus and claimed to have felt a non-anatomical object in the area of Tyus's buttocks.  As a result, Sergeant Christina authorized Officers Lynch, Newton and Pelchat to conduct a strip search.

The officers escorted Tyus to a separate room in order to perform the strip search, but Tyus refused to identify or remove the object from his buttocks.  Despite Tyus's resistance— which at one point led Sergeant Christina to threaten to tase him if he did not comply—Officers Lynch and Pelchat were able to bring Tyus to the floor, and Officer Newton then pulled down Tyus's pants.  The officers observed a plastic bag between Tyus's buttocks, which Officer Newton retrieved.  He and Officer Pelchat immediately recognized the substance in the bag as crack cocaine.  None of the officers entered a finger or other body part into Tyus's rectum during the search.

Afterwards, Officer Newton charged Tyus with additional criminal violations, including interference with a police officer, possession of drug paraphernalia, possession of marijuana,

possession of marijuana within 1500 feet of a housing project, possession of crack cocaine with intent to sell, and possession of crack cocaine with intent to sell within 1500 feet of a housing project.  Lieutenant Wright verified the incident report prepared by Officer Newton regarding the stop and searches on February 5, 2011.  Subsequently, Tyus was able to post bond, and the police released him from custody.

On February 28, 2011, a United States Magistrate Judge issued a warrant for Tyus's arrest on federal criminal charges based on the narcotics found on him in the course of the strip search conducted by the New London police.  *See United States v. Tyus*, No. 3:11-cr-00045, Doc. No. 1.  On March 3, 2011, Officer Newton stopped a vehicle in which Tyus was a passenger in order to enforce the outstanding federal warrant.  Officers O'Mara and Henderson responded as backup.  Officer Newton asked Tyus to exit the vehicle, searched him, and placed him under arrest in accordance with the warrant.  Because Officer Newton claimed to smell the odor of marijuana in the car, he searched the vehicle and recovered a knife belonging to Tyus in the pocket of the front passenger door.  Officer Newton then also charged Tyus with possessing a weapon in a motor vehicle and with carrying a dangerous weapon.

The officers transported Tyus to the New London police station, where Officer Newton conducted a pat search of Tyus.  He then sought and obtained from Lieutenant Bergeson permission to conduct a strip search of Tyus for contraband and weapons.  Officers Newton and Henderson conducted the search, but did not find any narcotics, weapons or other contraband.

On March 4, 2011, ATF Agents Riordan and Wheeler transported Tyus to federal court for his arraignment on the charge of possession of narcotics with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii).  Nearly one year later, on February 17, 2012, the

United States moved to dismiss the federal criminal charges against Tyus after learning that one

of the arresting New London police officers—Roger Newton—had been identified as having

planted drugs on a suspect during an arrest.  *See United States v. Tyus*, No. 3:11-cr-00045, Doc.

No. 71.  On February 21, 2012, pursuant to that motion, Tyus's federal criminal case was

dismissed.  *See id.*, Doc. No. 72.

In September 2012, Tyus appeared in state court for sentencing on the charges stemming

from his arrest on March 3, 2011, and on a charge of violating his probation.  Tyus pled guilty to

the charge of carrying a dangerous weapon and admitted the probation violation charge.  The

state court terminated Tyus's probation and sentenced him to three years of imprisonment on the

weapons possession charge.  The prosecutor entered nolle prosequi with respect to all other

pending charges, including those that were the basis for Tyus's arrest on February 5, 2011.

**III.**    **Discussion**

The motions for summary judgment filed by the New London defendants and defendant

Newton address the same claims.  Thus, I will consider both motions together.

**A.**    **Fifth and Fourteenth Amendment Claims**

Counts V and VI of the Amended Complaint purport to state claims for violation of

Tyus's due process rights under the Fifth and Fourteenth Amendments.[4]  Count V includes a

claim that all defendants conspired to deprive Tyus of his liberty in violation of rights protected

by the Fourth, Fifth, and Fourteenth Amendments, when they searched him in an unreasonable

manner on February 5, 2011 and arrested him without probable cause on February 5, 2011 and

---

[4] Count V is actually the sixth count of the Amended Complaint, and Count VI is actually the
seventh count, because there are two (presumably mislabeled) Counts III.  *See* Am. Compl., Doc.
No. 51, at ¶¶ 77–80.  By Counts V and VI, I mean the counts designated as such on page 23 of
the Amended Complaint.  *See id.* at ¶¶ 83–86.

March 3, 2011.[5]  Am. Compl., Doc. No. 51, at ¶¶ 83 & 84.  Count VI of the amended complaint alleges, among other things, that all defendants deprived Tyus of his liberty in violation of the substantive due process clause of the Fourteenth Amendment when they subjected him to false arrests.  *Id.* at ¶¶ 85 & 86.  I previously dismissed Tyus's Fourteenth Amendment due process claim against the federal defendants, *see* Order, Doc. No. 92, at 11–12, but did not address his Fifth Amendment due process claim against the New London defendants and Officer Newton.

To the extent that Tyus asserts a Fifth Amendment due process claim against Officer Newton and the New London defendants, I dismiss the claim because the Fifth Amendment due process clause applies only to actions by the United States government and federal employees. *See, e.g.*, *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (holding that the Fifth Amendment's Due Process Clause only protects citizens against the conduct of federal government officials, not state officials); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466–67 (S.D.N.Y. 2009) (dismissing a Fifth Amendment due process claim against the city because the plaintiff had not alleged that the federal government had violated his rights); *Cassidy v. Scopetta*, 365 F. Supp. 2d 283, 286 (E.D.N.Y. 2005) (dismissing Fifth Amendment due process claims against the city and fire department officials because defendants were not federal employees); *see also* 28 U.S.C. § 1915(e)(2)(B)(ii) (court may dismiss "at any time" portions of a complaint that "fail[] to state a claim on which relief may be granted"). The current and former municipal defendants are not federal employees, and so Tyus cannot state a claim against them for violating rights protected by the Fifth Amendment.

To the extent that Tyus asserts a *Fourteenth* Amendment due process claim against

_____

[5] Tyus also claims that the defendants conspired to deprive him of his liberty in violation of his Sixth Amendment rights.  As indicated above, the Sixth Amendment and conspiracy claims were dismissed on April 29, 2014.  Order, Doc. No. 51.

Officer Newton and the New London defendants for depriving him of his liberty, that claim fails because it is predicated on his Fourth Amendment false arrest claim.  As the United States Supreme Court has stated, if "a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).   Here, Tyus's claims of false arrest, excessive force and deprivation of liberty are all covered by the Fourth Amendment's protections against unlawful seizure.  Therefore, Tyus cannot state a general substantive due process claim, nor can he allege those same injuries as violations of his Fourteenth Amendment substantive due process rights.  *See id.* at 274–75 ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it . . . . [Therefore,] substantive due process . . . can afford [the plaintiff] no relief."); *Maliha v. Faluotico*, 286 F. App'x 742, 744 (2d Cir. 2008) (holding that plaintiff's substantive due process claim merged with his Fourth Amendment claim because the former claim arose from the same set of actions that allegedly violated his Fourth Amendment rights); *Pinter v. City of New York*, 976 F. Supp. 2d 539, 573 (S.D.N.Y. 2013) ("There is no cause of action for false arrest or unlawful stop under the Due Process Clause of the Fourteenth Amendment." (citations omitted))*; Snow v. Village of Chatham*, 84 F. Supp. 2d 322, 327 (N.D.N.Y. 2000) ("Constitutional claims arising out of a deprivation of liberty must be examined under Fourth Amendment standards, not due process standards under the Fifth and Fourteenth Amendments." (citations omitted)).

　　　As for Tyus's Fifth Amendment due process claims against the terminated federal

defendants, to the extent that I did not already address the Fifth Amendment due process claims

against them, *see* Order, Doc. No. 92, at 11–12, those claims fail for the same reasons applicable

to the Fourteenth Amendment due process claims.  Claims of due process violations arising

under the Fifth and Fourteenth Amendments are analyzed under the same standards.  *See Zynger*

*v. Dep't of Homeland Sec.*, 615 F. Supp. 2d 50, 55 n.5 (E.D.N.Y. 2009) ("There does not appear

to be any substantive difference between due process claims asserted under the Fifth

Amendment's due process clause . . . [and] the equivalent clause in the Fourteenth

Amendment."), *aff'd*, 370 F. App'x 253 (2d Cir. 2010).  Accordingly, I hold that the Fifth and

Fourteenth Amendment due process claims against all defendants fail as a matter of law and

must be dismissed.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

      **B.**      **Fourth Amendment Claims**

Tyus also raises various claims under the Fourth Amendment.  The Fourth Amendment to

the United States Constitution states that "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

U.S. Const. amend. IV.  It is clear from this language that "the ultimate measure of the

constitutionality of a government search or seizure is reasonableness."  *United States v. Bailey*,

743 F.3d 322, 331 (2d Cir. 2014) (internal quotation marks and citations omitted).  In Fourth

Amendment cases, reasonableness is "generally determined by balancing the particular need to

search or seize against the privacy interests invaded by such action."  *Id.*

To effectuate the protections of the Fourth Amendment, a police officer usually must

obtain a warrant from a judicial officer before conducting a search or a seizure.  *See California v.*

*Carney*, 471 U.S. 386, 390 (1985); *New York v. Belton*, 453 U.S. 454, 457 (1981).  There are a

number of exceptions to the warrant requirement, however, and a warrantless search or seizure that falls into such an exception may be considered reasonable and therefore valid under the Fourth Amendment.  *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (citing examples of recognized exceptions to warrant requirement).

One exception to the warrant requirement permits police officers to conduct certain warrantless searches and seizures in the course of traffic stops.  Although a police officer's "temporary detention of a person . . . [after] stop[ping] her vehicle . . . constitutes a seizure for Fourth Amendment purposes, and thus must not be unreasonable," *see Gilles v. Repicky*, 511 F.3d 239, 244–45 (2d Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)), officers may stop and detain a motorist when they have "at least articulable and reasonable suspicion . . . that either the vehicle or an occupant is . . . subject to seizure for violation of law," *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).  "[T]he reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop."  *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009).  To be sure, an initial detention by the police "must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative means employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." *Gilles*, 511 F.3d at 245 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)).  But if the traffic stop is lawful neither the driver nor any passengers have a "Fourth Amendment interest in not being ordered out of the stopped vehicle."  *Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000).  Thus, "a police officer may as a matter of course, order" a passenger or a driver out of "a lawfully stopped car."  *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (citing

*Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (per curiam)).

        1.      January 18, 2011 – Traffic Stop and Search

Officer Lamontagne states that he stopped Tyus on January 18, 2011, because Tyus failed to use his turn signal.  *See* Lamontagne Aff., Ex. A to New London Defs.' Mot. Summ. J., Doc. No. 97-4, at 3.  Officer Lamontagne believes that he issued Tyus a warning rather than a traffic infraction.  *Id.*  In fact, Tyus received a warning for failing to illuminate his rear license plate, *see* Warning Ticket, Pl.'s Ex. P to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 109, at 15, which constitutes an infraction under Connecticut law, *see* Conn. Gen. Stat. § 14-96c(d).

 At his deposition, Tyus testified that his rear license plate was illuminated on January 18, 2011.  *See* Tyus Dep. at 59:5–10, Ex. C to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-6, at 28.  In his opposition to the defendants' motion for summary judgment, Tyus further asserts that he checked the bulb after he was pulled over on January 18, and that it worked.  He states that he made no repairs to the bulb after the stop.  *See* Tyus Aff., Ex. A to Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 2.  These statements create a genuine issue of material fact regarding whether the defendants had a reasonable suspicion that Tyus was engaged in illegal activity.  Thus, the motion for summary judgment is denied with respect to Tyus's Fourth Amendment claim arising out of the January 18, 2011 traffic stop.

Tyus alleges that Officer Lamontagne claimed to smell marijuana in Tyus's vehicle during the stop, and that the officer ordered Tyus to exit the vehicle and conducted a pat search of Tyus's body.  Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 2–3.  According to Tyus, Officer Lamontagne also searched inside the pockets of Tyus's pants and extracted cash and an assisted-opening pocketknife.  *Id.* at 3.  Tyus clams that Officer

16

Henderson searched the vehicle, but found nothing illegal in it.  *Id.*  Before leaving the scene,

Tyus asserts, the officers issued Tyus a warning for a defective rear marker light and returned the

personal items that they had seized from his pockets.  *Id.* at 4.

Officers Henderson and Lamontagne state that do not remember if they searched Tyus.

*See* Lamontagne Aff., Ex. A to New London Defs.' Mot. Summ. J., Doc. No. 97-4, at 3;

Henderson Aff., Ex. B to New London Defs.' Mot. Summ. J., Doc. No. 97-5, at 3.  Thus, a

genuine issue of fact exists with regard to whether Officer Lamontagne searched Tyus; whether

Officer Henderson searched Tyus's car; and—given the possibility that the initial traffic stop was

illegal—whether there was a valid, reasonable basis to search Tyus or his car.  I conclude that the

disputed factual circumstances of the stop and possible search preclude me from holding that

Officers Lamontagne and Henderson are entitled to qualified immunity.  Therefore, I deny the

defendants' motion for summary judgment with respect to the claims that Officers Lamontagne

and Henderson violated Tyus's Fourth Amendment rights on January 18, 2011.

2.   <u>January 22, 2011 – Traffic Stop and Search</u>

Officers Henderson and Newton argue that they had reasonable suspicion to stop Tyus on

January 22, 2011 for a violation of a traffic law.  *See* Henderson Aff., Ex. B to New London

Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-5, at 3, 4–5; Def. Newton's Mem. Supp. Mot.

Summ. J., Doc. No. 96-1, at 5–6.  Officer Newton also contends that his decision to search Tyus

and his car in connection with the stop was reasonable.

a.   *Traffic Stop*

On January 22, 2011, Officers Henderson and Newton stopped Tyus for allegedly failing

to display a front marker plate.  Under Connecticut law, a front license plate must be displayed in

17

a conspicuous place.  *See* Conn. Gen. Stat. § 14-18(2).  In a document Tyus filed on February 23, 2015 in opposition to the federal defendants' motion to dismiss, he stated that there was a front license plate on his vehicle on January 22, 2011.  *See* Tyus Aff., Ex. A to Pl.'s Mem. Opp. Fed. Defs.' Mot. Dismiss, Doc. No. 78-1, at 5.  Although that document is titled "Affidavit of GerJuan R. Tyus," it was not sworn under penalty of perjury or notarized.  *See id.*  Eight months later, at Tyus's deposition on September 30, 2015, counsel for the defendants asked Tyus if he had a license plate on the front of his vehicle on January 22, 2011 or on February 5, 2011.  Tyus testified that he did not remember.  *See* Tyus Dep. at 12:23–13:4, 23:9– 11, Ex. C to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-6, at 3–4, 10.  In his affidavit in opposition to the motions for summary judgment, Tyus now asserts that there was a front license plate on the vehicle on January 22, 2011 and on February 5, 2011.  *See* Tyus Aff., Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 4, 5.[6]  Tyus's affidavit is essentially identical to the document he submitted in opposition to the federal defendants' motion to dismiss, except that the affidavit was notarized and dated December 1, 2015.  *Cf.* Ex. A to Pl.'s Mem. Opp. Fed. Defs.' Mot. Dismiss, Doc. No. 78-1, at 4.

The defendants contend that Tyus cannot create an issue of material fact at this juncture by filing an affidavit that contradicts his earlier deposition testimony.  New London Defs.' Reply to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 106, at 1–3.  As indicated above, however, prior to Tyus's deposition on September 30, 2015, he already had filed a document that stated there was a front license plate on his vehicle at the time he was pulled over.  *See* Ex. A to Pl.'s Mem. Opp. Fed. Defs.' Mot. Dismiss, Doc. No. 78-1, at 4.  Thus, the affidavit filed in opposition

[6] The affidavits do not explicitly state that Tyus displayed a front license plate on February 5, but do emphasize that he was driving the same vehicle in identical condition.  The fairest reading of Tyus's affidavits is that he did display the same plate.

18

to the motion for summary judgment does not necessarily contradict Tyus's deposition testimony.  Instead, the two may be entirely consistent:  Tyus may not have remembered if he displayed a front license plate on the relevant date at the time of his deposition, even though he did remember at the time of his earlier affidavit.  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F. 3d 11, 22–23 (2d Cir. 2014) (explaining that the contradiction must be "real, unequivocal, and inescapable"); *Hayes v. N.Y. Dep't of Corrs.*, 84 F.3d 614, 619–20 (2d Cir. 1996) (holding district judge had erred in discrediting portions of appellant's second deposition because, the first and second depositions were only "arguably contradictory.").

I find that a genuine issue of material fact does exist with regard to whether Tyus's vehicle displayed a front license plate on January 22, 2011, and that a jury must decide if the officers reasonably believed that Tyus was violating a traffic law at the time of the stop.  Officers Henderson and Newton have not met their burden to show that they are entitled to judgment as a matter of law on Tyus's claim that the stop on January 22, 2011 was unreasonable and violated his rights under the Fourth Amendment.  Identical issues of material fact prevent me from determining that Officers Newton and Henderson are entitled to qualified immunity with regard to this claim.  I deny the defendants' motions for summary judgment with respect to the legality of the traffic stop on January 22, 2011.

b.     *Search at Scene of Traffic Stop*

As for the search conducted at the scene of the traffic stop on January 22, 2011, Tyus states that Officer Newton claimed to smell the odor of unburned marijuana in the vehicle and ordered him to exit the car.  Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 4.  Tyus concedes that he had been smoking marijuana in the car earlier that day.  Tyus

Dep. at 13:14–21, Ex. C to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-6, at 4.

According to Tyus, the search performed by Officer Newton exceeded the scope of a simple pat down.  Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103, at 16.  Tyus contends that Officer Newton searched inside the pockets of Tyus's pants to seize an assisted-folding knife, and also repeatedly grabbed Tyus's crotch and buttocks.  Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 4.  Officer Henderson disputes Tyus's account and states that he did not observe Officer Newton engage in an intrusive search or grab Tyus's buttocks or groin, Henderson Aff., Ex. B to Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-5, at 4, but he did not provide a description of the search in his police incident report, *see* Incident Rep., Ex. C to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-6, at 3.  Nor did Officer Newton, for his part, file an affidavit describing the search in support of his motion for summary judgment.  Thus, there remains an issue of material fact with regard to whether Officer Newton's search of Tyus exceeded the bounds of a pat down search for narcotics.  *See Jackson v. Waterbury Police Dep't*, No. 3:11-cv-642, 2015 WL 5251533 at *4 (D. Conn. Sept. 8, 2015) (denying motion for summary judgment because "warrantless search of an individual's pockets is *per se* unreasonable under the Fourth Amendment unless it falls within one of several exceptions, none of which ha[s] been shown by defendants to apply"); *Collier v. Locicero*, 820 F. Supp. 673, 679 (D. Conn. 1993) (acknowledging that "evidence indicating that a frisk was excessively rough or intrusive is sufficient to raise questions of fact that preclude summary judgment" on a Fourth Amendment search claim).  I deny the Officer Newton's motion for summary judgment with respect to Tyus's Fourth Amendment illegal search and seizure claim arising out of the January 22, 2011 stop.

With respect to Tyus's claim against Officer Henderson, although Officer Henderson did not participate in the search, he was present at the scene and observed it.  In view of the factual disputes over to the nature of the search, issues of material fact exist with regard to whether it was objectively reasonable for Officer Henderson to believe that Officer Newton did not violate Tyus's rights under the Fourth Amendment.  Thus, I also deny the New London defendants' motion for summary judgment with respect to Tyus's Fourth Amendment illegal search and seizure claim arising out of the January 22, 2011 stop.  Because the parties genuinely dispute the facts surrounding the nature and conduct of the search, I find that I cannot determine at this time that either officer is entitled to qualified immunity.

### 3.    February 5, 2011 – Traffic Stop, Search at Scene, and Strip Search

Officer Newton argues that he had probable cause to stop Tyus for a violation of a traffic law on February 5, 2011, and that his decision to search Tyus at the scene was reasonable.  Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-1, at 13–14.  Officer Lynch argues that his decision to pat down Tyus at the scene also was reasonable.  Lynch Aff., Ex. E to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-8, at 3.  Furthermore, Officers Lynch, Newton, Pelchat and Christina all contend that the decision to conduct the strip search of Tyus at the police station was based on a reasonable suspicion that Tyus was concealing contraband or weapons.  *Id.* at 4; Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-1, at 16–17; Pelchat Aff., Ex. G to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-10, at 3; Christina Aff., Ex. H to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-11, at 3.

### a.    *Traffic Stop*

Officer Newton argues that he had several grounds to pull over Tyus on February 5,

2011.  First, he asserts that Tyus's vehicle did not have a front license plate; second, that Tyus had tinted front side windows without a permit; and third, that Tyus had driven too quickly in dangerous weather conditions.  Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-1, at 13. The first and third justifications appear inconsistent with the contemporaneous recording by the camera inside Officer Newton's police cruiser.  *Compare* Incident Rep., Ex. D to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-7, at 4, *with* Ex. F to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9.  Based on the video, Tyus's front license plate (or the absence thereof) would not have been visible from Officer Newton's patrol car in the direction the officer was traveling.  Moreover, Officer Newton does not appear to have been close enough to Tyus's car when he initiated the stop to have observed that Tyus was driving too fast for the weather conditions.  *See id.*  Were these Officer Newton's only justifications, I might hold that there are genuine issues of material fact with respect to the reasonableness of the officer's belief that Tyus had violated state traffic laws.

These are not Officer Newton's only justifications, however, and the video does corroborate his second rationale for stopping Tyus.  The video establishes that Officer Newton could see that Tyus had tinted front side windows, in violation of Connecticut General Statutes § 14-99g.  *See id.*  Moreover, Tyus concedes that his windows were tinted on February 5, 2011 when Officer Newton pulled him over.  *See* Tyus Aff., Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 5.  Because "[t]he objective reasonableness of an officer's suspicion preceding any given traffic stop depends on the totality of the circumstances leading to that stop and on the traffic law at issue," the stop justified on any one of Officer Newton's asserted grounds.  *See United States v. Diaz*, 802 F.3d 234, 239 (2015) (emphasis removed).  In light of

Officer Newton's reasonable belief that Tyus had committed a motor vehicle violation, I

conclude that the traffic stop was reasonable under the Fourth Amendment.  Thus, I grant Officer

Newton's motion for summary judgment with regard to Tyus's claim that the stop on February 5,

2011 violated the Fourth Amendment.

> b.    *Search at Scene of Traffic Stop*

Officer Newton states in his police incident report that he recognized Tyus upon speaking

to him through the driver's side window.  *See* Incident Rep., Ex. D to Def. Newton's Mem.

Supp. Mot. Summ. J., Doc. No. 96-7, at 4.  The officer claims that he knew Tyus to be a

narcotics dealer who had been involved in a number of gun-related incidents in the New London

area.  *See id.*  In addition, Officer Newton states that he was aware that Tyus had been arrested

on weapons and narcotics charges, and that Tyus was a member of a violent and dangerous gang

that encourages its members to carry weapons.  *See id.*  Based on that knowledge, the officer

asserts that he asked Tyus to exit the vehicle because he thought Tyus might be armed and feared

for his own safety.  *See id.*  In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that a

police officer with a reasonable suspicion (based on articulable facts) that a suspect may be

engaged in criminal activity and may be armed and dangerous, may detain the suspect briefly for

purposes of limited questioning and, in doing so, may conduct a quick "frisk" of the suspect to

protect himself or others from concealed weapons.  *Id.* at 30.

The video of the stop and search shows Tyus dropping an object on the front seat of his

car as he stands up to exit the vehicle.  *See* Ex. F to Def. Newton's Mem. Supp. Mot. Summ. J.,

Doc. No. 96-9.  Tyus can be heard saying that the object is his knife, and replying no when

Officer Newton asks if Tyus has any other knives or weapons on him.  *See id.*  The officer does

not immediately pick up the knife from the front seat of the vehicle.  Instead, he instructs Tyus to turn and face the vehicle and place his hands on the hood.  *See id.*  Officer Newton then conducts a search of Tyus while Officer Marcaccio stands nearby, observing the entire incident.  *See id.*

Tyus contends that the search conducted by Officer Newton went beyond a simple pat down or frisk search and became more intrusive.  *See* Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103, at 16.  Conversely, Officer Newton and the New London defendants characterize the search as nothing more than a pat down over Tyus's clothes.  *See* Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-1, at 13–14; New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-1, at 18–19.  The video supports Tyus's view.  *See* Ex. F to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9.  The recording clearly shows Officer Newton searching inside many of Tyus's pants pockets and grabbing the outside of his groin and buttocks area multiple times.  *See id.*  The defendants do not convincingly argue that the search met any of the exceptions to the Fourth Amendment's warrant requirement.  Although Officer Newton contends that he searched Tyus out of fear for his safety, his claim is belied by video evidence that he did not retrieve Tyus's knife from the front seat until approximately five minutes after the search, and did not handcuff Tyus until ten minutes after that.  In light of that delay, I cannot hold— particularly when "resolv[ing] all ambiguities and draw[ing] all inferences in favor of the nonmoving party," as on a motion for summary judgment I must, *see Aldrich*, 963 F.2d at 523— that Officer Newton "reasonably . . . belie[ved] that his safety or that of others was in danger," potentially justifying his invasive search under *Terry*.  *See Terry*, 392 U.S. at 27.

Thus, with regard to Tyus's claim that Officer Newton unreasonably searched him while Officer Marcaccio looked on and failed to intervene, I conclude that the defendants have neither

shown an absence of genuine issues of material fact, nor demonstrated that they are entitled to judgment as a matter of law.  Accordingly, I deny the motions for summary judgment on this claim.  *See Jackson*, 2015 WL 5251533 at *4 (denying motion for summary judgment because "warrantless search of an individual's pockets is *per se* unreasonable under the Fourth Amendment unless it falls within one of several exceptions, none of which have been shown by defendants to apply"); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").

Shortly after the initial search of Tyus was performed by Officer Newton, Officer Pelchat arrived.  Ex. F to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9.  As the video depicts, Officer Pelchat assisted Officer Marcaccio when she searched Tyus's passenger.  *See id.*  Officer Lynch then arrived approximately fifteen minutes after Officer Newton completed his initial search, and spoke to Tyus as he stood at the back of his vehicle.  *See id.*  After that conversation, Officer Lynch and Officer Newton walked away from Tyus.  When they returned, Officer Newton handcuffed Tyus's wrists, and Officer Lynch performed two brief manual searches over Tyus's clothes in the area of his buttocks while Officers Pelchat and Marcaccio looked on.  *See id.*  Following those searches, Officers Lynch and Newton placed Tyus in Officer Marcaccio's patrol car.  *See id.*

Considering both the video and Officer Lynch's affidavit, I cannot hold the officer's searches fell within the scope of a brief pat down permitted by *Terry*.  The parameters of a protective search pursuant to *Terry* are well established: a protective frisk "is not to discover

evidence of a crime" but is strictly limited to ascertaining whether the suspect has a weapon

which might be used to harm the officer or officers nearby." *Minnesota v. Dickerson*, 506 U.S.

366, 373 (1993) (internal quotation marks and citations omitted).  Furthermore, the Second

Circuit has indicated that handcuffing is permissible during a *Terry* stop only when the "police

have a reasonable basis to think that the person detained poses a present physical threat and that

handcuffing is the least intrusive means to protect against that threat."  *See United States v.*

*Bailey*, 743 F.3d 322, 340 (2d Cir. 2014).  Again "resolv[ing] all ambiguities and draw[ing] all

inferences in favor of the nonmoving party," *see Aldrich*, 963 F.2d at 523, I conclude that the

delay between Officer Newton's initial stop and Officer Newton's and Lynch's later searches

and handcuffing prevent me from holding as a matter of law that the officers did not violate the

Fourth Amendment.  *See Bailey*, 743 F.3d at 340 ("[T]he law does not categorically assume that

every investigatory stop related to particular crimes requires handcuffing, particularly when a

patdown outside a vehicle reveals the detainee to be unarmed."); *cf. Ozga v. Elliot*, 150 F. Supp.

3d 178, 190 (D. Conn. 2015) (holding that police officers were entitled to qualified immunity

because handcuffing was reasonable when "in the immediate aftermath of the discovery of a gun

shot victim . . . the police made an initial assessment of what had happened and whether there

was a continuing risk of violence or foul play").

    For the same reasons, I hold that genuine issues of material fact regarding the manner in

which the searches were performed preclude a determination that either Officer Newton or

Officer Lynch is entitled to qualified immunity on Tyus's claims.  Likewise, the same disputed

facts make it impossible for me to determine if it was objectively reasonable for Officer Pelchat

and Officer Marcaccio to have believed they had no obligation to intervene to prevent Officer

Lynch from violating Tyus's Fourth Amendment rights during the searches. *See Anderson,* 17

F.3d at 557 ("An officer who fails to intercede is liable for the preventable harm caused by the

actions of the other officers where that officer observes or has reason to know . . . that any

constitutional violation has been committed by a law enforcement official.").  I deny the motions

for summary judgment with regard to Tyus's claims against Officers Lynch, Newton, Marcaccio,

and Pelchat for an illegal search conducted on February 5, 2011.

> c.     *False Arrest*

Tyus also claims that Officer Newton falsely arrested him on February 5, 2011.  *See* Am.

Compl., Doc. No. 51, at ¶¶ 47, 86.  As the Second Circuit has held, the Fourth Amendment's

protections include the right to be free from arrests without probable cause.  *See Weyant v. Okst*,

101 F.3d 845, 852 (2d Cir. 1996).  "Claims for false arrest or malicious prosecution, brought

under [section] 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from

unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious

prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).  In a section

1983 action, the elements of a claim for false arrest are controlled by state law.  *See Davis v.

Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004); *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994).

Connecticut law defines false arrest or false imprisonment as "the unlawful restraint by

one person of the physical liberty of another.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 204

(2d Cir. 2007) (internal quotation marks and citation omitted).  Under both Connecticut law and

section 1983, a plaintiff must allege that the prosecution terminated in his or her favor in order to

state a claim of false arrest.  *See Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011)

(holding district court did not err in granting summary judgment on false arrest claim because

"the Court [has] expressly held, invoking Connecticut law, that favorable termination is an element of 'a section 1983 sounding in false imprisonment and false arrest'" (quoting *Roesch v. Otarola*, 980 F.2d 850, 853-54 (2d Cir. 1992)).

In addition, even if the criminal matter terminated in the plaintiff's favor, "the existence of probable cause is a complete defense to a civil rights claim alleging false arrest." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 449 (D. Conn. 2002). Probable cause only exists when police officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. The probable cause requirement does not mean that the police officer must be certain his arrestee will be prosecuted successfully, however, nor does it demand that the officer continue investigating a claim of innocence prior to the arrest. *See Panetta v. Crowley*, 460 F.3d 388, 398 (2d Cir. 2006); *Jocks*, 316 F.3d at 135–36; *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989).

On February 5, 2011, Officer Newton arrested Tyus on multiple criminal charges pursuant to the traffic stop and searches incident to the stop, including for possessing a weapon in a motor vehicle in violation of Connecticut General Statutes § 29-38, and carrying a dangerous weapon in violation of Connecticut General Statutes § 53-206. *See* Incident Rep., Ex. I to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-12. According to Tyus, a prosecutor later entered a nolle prosequi of all charges that formed the basis of his arrest on February 5, 2011. Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 11.

Ordinarily, the entry of a nolle prosequi will satisfy the favorable-termination requirement for a malicious prosecution or false arrest claim. *See Roberts v. Babkiewicz*, 582

28

F.3d 418, 421 (2d Cir. 2009) ("The majority of cases from Connecticut courts interpret

Connecticut law so that a nolle prosequi satisfies the favorable termination element as long as the

abandonment of the prosecution was not based on an arrangement with the defendant." (internal

quotation marks and citation omitted)).  Tyus testified at his deposition that the dismissal of the

charges for which he was arrested on February 5, 2011 was not a condition of his guilty plea to

the gun possession charge that was the basis of his arrest on March 3, 2011.  *See* Tyus Dep. at

71:10–13, Ex. C to New London Defs.' Mem. Supp. Mot. Summ. J., at 38; *see also* Plea &

Sentencing Tr., *State v. Tyus*, No. K10-CR11-0312202-S, Ex. T to Pl.'s Mem. Opp. Defs.' Mot.

Summ. J., Doc. No. 109, at 12–13.  The defendants offer no evidence to contradict Tyus's

account of the circumstances surrounding the prosecutor's entering the nolle prosequi.  Thus, the

only evidence in the record shows that the criminal matter terminated in Tyus's favor.

Nevertheless, the video of the traffic stop on February 5, 2011 shows that Officer Newton

saw a knife fall out of Tyus's pocket and onto the car seat as Tyus stood up to exit the car.  *See*

Ex. F to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9.  Under Connecticut General

Statutes § 53-206(a), person who carries one of various types of weapons, "or any other

dangerous or deadly weapon or instrument shall be guilty of a class E Felony."  Moreover, under

Connecticut General Statutes § 29-38(a), a "person who knowingly has, in any vehicle owned,

operated or occupied by such person, any weapon . . . shall be guilty of a class D felony."  The

word weapon as defined in the statute constitutes various instruments and "any other dangerous

or deadly weapon or instrument."  *Id.*  Based on the circumstances confronting Officer Newton, I

conclude that it was reasonable for him to believe that Tyus was carrying a dangerous weapon in

violation of Connecticut General Statutes § 53-206 as well as possessing a weapon in a motor

vehicle in violation of Connecticut General Statutes § 29-38.  Therefore, Officer Newton had

probable cause to arrest Tyus for carrying a dangerous weapon and possessing a weapon in a

motor vehicle.  That Tyus was not subsequently convicted of those charges does negate the

probable cause to arrest him.  *See Ahern v. City of Syracuse*, 411 F. Supp. 2d 132, 147 (N.D.N.Y.

2006) (noting that "eventual disposition of the criminal charges is irrelevant to the probable

cause determination").  Because probable cause supported Tyus's arrest on February 5, 2011 for

carrying and possession of a dangerous weapon, I hold that the false arrest claim fails, and I

grant the defendants' motions for summary judgment with regard to that claim.

> d.  *Strip Search at Station*

Officers Newton, Lynch, Pelchat and Christina argue that they had a legitimate basis to

order and conduct a strip search of Tyus at the New London Police station after his arrest on

February 5, 2011.  They further contend that the strip search was conducted reasonably.  *See* Def.

Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-1, at 16–17; Lynch Aff., Ex. E to New

London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-8, at 4; Pelchat Aff., Ex. G to New

London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-10, at 3; Christina Aff., Ex. H to New

London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-11, at 3.

When undergoing a strip search, a suspect or arrestee "is required to remove his [or her]

clothes."  *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (citation omitted).

Police officers perform a visual cavity search by observing the body cavities of an unclothed

suspect or arrestee without touching them.  *See id.*  As the Second Circuit has explained, a strip

search is considered to be "an extreme intrusion upon the personal privacy, as well as an offense

to the dignity of the individual."  *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991)

(citations omitted).

It is well established that a person arrested for a misdemeanor may be strip-searched only if police officers "have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986). Here, Tyus had been charged with a felony offense, not a misdemeanor, but a number of courts within this circuit have applied the same standard to felony arrestees. *See, e.g.*, *Jackson*, 2015 WL 5251533, at *9 (applying reasonable suspicion that arrestee was concealing weapons or contraband standard to strip search performed on individual arrested on felony narcotics charges); *Sorrell v. Inc. Village Lynbrook*, No. 10-cv-49, 2012 WL 1999642, at *6 (E.D.N.Y. June 4, 2012); *Sarnicola v. Cnty. of Westchester*, 229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002). I find the reasoning of those cases persuasive, and will apply the Second Circuit's familiar standard for misdemeanors to the strip search conducted after Tyus's arrest on felony weapon possession charges.

As is apparent from the video, Officers Newton and Marcaccio noticed the odor of marijuana coming from Tyus's vehicle after the traffic stop on February 5, 2011. *See* Ex. F to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9. Tyus was carrying a knife when he was pulled over, *see* Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 6, and proved evasive in his answers to Officer Newton's questions, Incident Rep., Ex. D to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-7, at 4. Officer Newton also claims to have observed Tyus's hands shaking. Incident Rep., Ex. D to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-7, at 4. Moreover, Officer Newton asserts that he knew Tyus as a drug dealer who had been arrested on narcotics charges in the past. *See id.* During pat searches of

31

Tyus (both at the scene of the traffic stop and again at the station), Officers Newton and Lynch both assert they felt a non-anatomical object in Tyus's buttocks.  *See id.*; Lynch Aff., Ex. E to New London Defs.' Mem. Supp. Mot. Summ. J., at 3.  Officer Newton also discovered a large amount of cash in Tyus's pockets.  *See* Ex. F to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9.  In Officer Newton's experience, drug dealers often conceal narcotics or other contraband in their buttocks in an effort to conceal those items from the police.  *See* Incident Rep., Ex. D to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-7, at 4.  Hence, based on the crime charged, the characteristics of an arrestee known to the defendants, and the circumstances of the prior pat searches, I hold that the officers had a reasonable suspicion that Tyus was concealing a weapon or narcotics on his person.  *See United States v. Asbury*, 586 F.2d 973, 976-77 (2d Cir. 1978) (citing factors to be taken into account when determining issue of whether a reasonable suspicion exists for strip search).  Accordingly, the defendants' decision to strip search Tyus following his arrest on February 5, 2011 did not violate his Fourth Amendment rights.

Even if there was a legitimate basis to conduct the strip search, however, Tyus claims that the manner in which the search was conducted was unreasonable and constituted excessive force. The Fourth Amendment requires that strip searches of inmates be reasonable.  *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  In determining whether a particular strip search is reasonable, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Id.* at 559. In addition, claims of excessive force arising in the context of an arrest are analyzed under the Fourth Amendment's objective reasonableness test, which requires that courts pay "careful

attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989).

Applying the reasonableness test here, I note that when Tyus arrived at the New London Police station, he was in handcuffs. *See* Ex. G to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9. An audio recording[7] from the station booking area reveals a male voice telling Tyus that he can remove the item from his buttocks himself, or it will be forcefully removed. *See id.* Tyus denies having anything in his buttocks.

Shortly after that exchange, Officers Newton, Lynch and Pelchat escort Tyus to a room near the booking area. *See* Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103-1, at 8. Because of a departmental policy against female officers strip-searching male arrestees when male officers were available, Officer Marcaccio did not leave the booking area or enter the room where the strip search took place. *See* Marcaccio Aff., Ex. F to New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-9, at 4.

The officers ordered Tyus to lie face down on the floor, but he refused to do so. *See* Tyus Aff., Ex. A to Pl.'s Mem. Opp. Mot. Summ. J., Doc. No. 103-1, at 8. Sergeant Christina heard a commotion in the room and a male officer asked her to bring her Taser. *See* Christina Aff., Ex. H to New London Defs.' Mem. Supp. Mot. Summ. J., at 3–4.; Ex. G to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9. Sergeant Christina opened the door to the room, ordered

---

[7] Once Tyus was removed from the police vehicle by Officer Pelchat, only an audio recording is available for the events that occurred in the booking area of the station. The video for the recording simply is a photo of the back seat of the patrol car in which Tyus was transported to the station. *See* Ex. G to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-9.

Tyus to get face down on the ground and threatened to use her Taser on Tyus if he continued to resist. *See* Christina Aff., Ex. H to New London Defs.' Mem. Supp. Mot. Summ. J., at 4. As soon as the other officers were able to control Tyus, Sergeant Christina left the room.

Officers Lynch and Pelchat physically grabbed Tyus and brought him down to the floor. *See* Christina Aff., Ex. H to New London Defs.' Mem. Supp. Mot. Summ. J., at 4; Lynch Aff., Ex. E to New London Defs.' Mem. Supp. Mot. Summ. J., at 4; Pelchat Aff., Ex. G to New London Defs.' Mem. Supp. Mot. Summ. J., at 4. Officer Lynch held Tyus still, while Officer Newton pulled Tyus's pants down and removed a bag of narcotics that protruded from his buttocks. Lynch Aff., Ex. E to New London Defs.' Mem. Supp. Mot. Summ. J., at 4; Pelchat Aff., Ex. G to New London Defs.' Mem. Supp. Mot. Summ. J., at 4. After the search, the officers picked Tyus up off of the floor, pulled up his pants, and escorted him to a bench in the receiving area. *See* Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., at 9. Officer Newton then allegedly removed Tyus's belt, yanked off Tyus's boots and removed the laces from the boots. *Id.*

The strip search was limited in scope and was conducted in a separate room. Tyus concedes that he refused to lie on the floor or identify or remove the object from his buttocks. Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., at 8. In order to preserve possible evidence of contraband and to protect the safety of the officers, I hold that it was reasonable for Officers Lynch, Newton, and Pelchat to force Tyus onto the ground in order to retrieve the object from his buttocks. Once Tyus was on the ground, Officer Newton removed the bag that was protruding from Tyus's rectum. No officer reached into any of Tyus's body cavities. Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., at 9; Lynch Aff., Ex. E to New London Defs.'

34

Mem. Supp. Mot. Summ. J., at 4; Pelchat Aff., Ex. G to New London Defs.' Mem. Supp. Mot.

Summ. J., at 4; Incident Rep., Ex. D to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-

7, at 5.  After Officer Newton removed the plastic bag, he and Officers Lynch and Pelchat helped

Tyus back up, pulled up Tyus's pants, and escorted him out of the room to the receiving area.

Tyus Aff., Ex. A to Pl.'s Mem. Opp. Defs.' Mot. Summ. J., at 9.

Thus, the search was conducted in a reasonable manner and the location of the search was

relatively private.  In addition, the force employed by Sergeant Christina and Officers Lynch,

Newton, and Pelchat was not excessive because Tyus would not remove the item from his

buttocks himself and initially refused to lie down and submit to the strip search.  Thus, I hold that

the strip search of Tyus was lawful under the Fourth Amendment.  *See United States v.

Gonzalez*, No. 08-cr-363, 2009 WL 613201 at * 7-8 (S.D.N.Y. Mar. 4, 2009) (holding arrestee's

refusal to cooperate with strip search, his agitation and bagginess of his clothing justified strip

search by three officers while the arrestee was handcuffed and the limited scope of search in

private location did not violate arrestee's Fourth Amendment rights).  I grant the defendants'

motions for summary judgment with regard to defendants' decision to conduct the February 5,

2011 strip search as well as the reasonableness of the manner, scope and justification of the strip

search.

4.      March 3, 2011 – Arrest, Search at Scene and Strip Search

I previously dismissed Tyus's false arrest claim related to his March 3, 2011 arrest for

possession of a dangerous weapon.  Order, Doc. No. 84, at 13.  I need not re-visit that claim here.

a.      *Search at Scene of Arrest*

The defendants argue that the search of Tyus at the scene of his arrest was permitted

under the exception to the warrant requirement for searches incident to arrests.  New London

Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-1, at 34–35.  Tyus alleges that the search was

unnecessarily intrusive.  Pl.'s Mem. Opp. Defs.' Mot. Summ. J., Doc. No. 103, at 5.  Officer

Newton does not address the search allegedly conducted at the scene of Tyus's arrest.  *See* Def.

Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-1, at 23.  It is evident, however, that no facts

suggest that Officers O'Mara, Schafranski, or Henderson were involved in the search.

Therefore, I grant the motion for summary judgment with respect to Tyus's claim against

Officers O'Mara, Henderson, and Schafranski for the search at the scene of his arrest.

b. *Strip Search at Station*

Lieutenant Bergeson and Officers Henderson and Newton contend that after Tyus's arrest

pursuant to the federal warrant and on charges of possessing and carrying a dangerous weapon,

they had a reasonable basis to strip-search Tyus.  *See* Henderson Aff., Ex. B to New London

Defs.' Mot. Summ. J., Doc. No. 97-5, at 6; Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No.

96-1, at 23; Bergeson Aff., Ex. O to New London Defs.' Mot. Summ. J., Doc. No. 97-18, at 4.

Tyus disagrees and argues that no basis existed to conduct the search.  He does not contest the

manner in which the search was conducted.  *See* Tyus Dep. at 44:1–14, Ex. C to New London

Defs.' Mot. Summ. J., Doc. No. 97-6, at 23.

The officers assert that they had a reasonable suspicion that Tyus was concealing a

weapon or narcotics on his person, based on the fact that Tyus clenched his buttocks when

Officer Newton pat-searched him.  *See* Incident Rep., Ex. E to Def. Newton's Mem. Supp.

Summ. J., Doc. No. 96-8, at 3.  Furthermore, the defendants note, the prior strip search of Tyus

on February 5, 2011 had revealed narcotics concealed in the area of his buttocks.  In addition,

36

Officer Newton detected an odor of marijuana in the car in which Tyus was a passenger when he was arrested, but did not find any narcotics in the car after searching it. *See id.* One of the officers—exactly which is not specified in the incident report—did recover a knife from the passenger side pocket of that car. *See id.* Officer Newton understood that the buttocks are a common area to conceal narcotics and drugs, and avers that he knew Tyus to be a member of a violent gang that encourages its members to carry weapons. *See id.* Nevertheless, given that Officer Newton's pat searches of Tyus at the time of his arrest had not revealed any evidence of contraband, and considering that no narcotics were seized during the search of the vehicle in which Tyus had been riding, it is debatable whether the circumstances and facts known to Officer Newton formed a sufficient basis to support a reasonable suspicion that Tyus might be concealing contraband or weapons at the time of his arrest on March 3, 2011.

  Even if the facts known to the defendants did not support a reasonable suspicion to justify the strip search, however, I hold that the defendants are entitled to qualified immunity on this claim. In 2013, the Second Circuit held that the right to be free from a suspicionless strip search or visual body cavity search after an arrest for a drug possession felony was not clearly established, and so that police officers accused of such conduct were entitled to qualified immunity. *Gonzalez*, 728 F.3d at 161–62. The Court acknowledged that it had never held the Fourth Amendment to be violated by a suspicionless strip search or body cavity search of a person arrested for a felony. *See id.* at 161. Although the Second Circuit had "repeatedly held that the police may not conduct a suspicionless strip or body cavity search of a person arrested for a *misdemeanor*, reasonable officers could disagree as to whether that rule applied to those arrested for felony drug crimes." *See id.* (emphasis added). Thus, the Court concluded that "a

reasonable officer—even one familiar with the cases [governing strip searches] would not have understood that conducting an otherwise suspicionless visual body cavity search of a person arrested for a felony drug offense was unlawful."  *Id.* at 162.  Furthermore, even in *Gonzalez*, the Second Circuit declined to "h[old] that the Fourth Amendment is violated by a suspicionless search . . . of a person arrested for felony drug possession."  *Id.* at 161.

Here, the plaintiff was arrested on two felony weapons possession charges in 2011.  In view of the fact that the Second Circuit has never held that the reasonable suspicion standard for strip searches set forth for misdemeanor arrestees in *Weber*, 804 F.2d at 802, and *Shane v. Ellison*, 273 F.3d 56, 66 (2d Cir. 2001), must be applied to persons arrested on felony charges, reasonable officers could disagree about whether *Weber* and *Shane* governed searches of felony arrestees.  Thus, I conclude that the defendants are entitled to qualified immunity with regard to their decision to conduct a strip search and visual body cavity search of Tyus after his arrest on a felony weapons charge.  Accordingly, I grant the defendants' motions for summary judgment on the basis of qualified immunity with regard to the March 3, 2011 decision to conduct the strip search.

### C.      Personal Involvement – Supervisory Liability

Sergeant McBride and Lieutenants Wright and Bergeson argue that the claims against them must be dismissed because they were not sufficiently involved in the alleged unconstitutional searches and seizures of Tyus.  New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-1, at 42–45.  To recover money damages under section 1983, a plaintiff must show that a defendant was personally involved in the constitutional violations.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  A supervisory official cannot be held liable under section 1983

solely "on the basis of respondeat superior or simply because he is atop the prison hierarchy." *Lewis v. Cunningham*, 483 F. App'x 617, 619-20 (2d Cir. 2012) (citation omitted).

A plaintiff may show personal involvement through evidence that the defendant: (1) actually and directly participated in the alleged unconstitutional acts; (2) failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) created or approved a policy or custom that sanctioned objectionable conduct that rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) was grossly negligent in supervising the officers who committed the constitutional violation; or (5) failed to take action in response to information regarding the occurrence of unconstitutional conduct.  *See Colon*, 58 F.3d at 873.  In addition, a section 1983 plaintiff such as Tyus must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury.  *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court addressed supervisory liability in the section 1983 context, and concluded that a supervisor can be held liable only "through the official's own individual actions."  *Id.* at 676.  Although that decision arguably casts doubt on the continued viability of some of the categories for supervisory liability set forth in *Colon,* the Second Circuit has not yet revisited the criteria for supervisory liability following *Iqbal*.  *See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test . . . after *Iqbal*."); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but finding it unnecessary to reach the impact of *Iqbal* on the personal

involvement requirements set forth in *Colon*).  Because it is unclear whether *Iqbal* overrules or limits *Colon*, I will continue to apply the pre-*Iqbal* categories for supervisory liability set forth by the Second Circuit.

In the instant case, Tyus does not allege that Sergeant McBride or Lieutenants Wright or Bergeson were present at or were otherwise involved in the traffic stops, searches or arrests that occurred on January 18, 2011, January 22, 2011, February 5, 2011, and March 3, 2011.  Tyus simply seeks to hold those defendants liable because their names appear on incident reports completed by officers within the New London Police Department who were involved in stopping his vehicle, issuing him traffic infractions, searching him and his vehicle, and arresting him. Sergeant McBride and Lieutenants Wright and Bergeson are identified on those reports as verifying officers.  *See, e.g.*, Incident Rep., Ex. E to Def. Newton's Mem. Supp. Mot. Summ. J., Doc. No. 96-8, at 2.

Tyus does not allege that Sergeant McBride or Lieutenants Wright or Bergeson were on notice of any false statements in the reports, or that they were involved in creating a custom or practice giving rise to unconstitutional conduct.  Nor are there any facts to infer that those defendants were grossly negligent in supervising the officers directly involved in alleged violations of Tyus's Fourth Amendment rights.  Thus, Tyus has failed to allege sufficient facts to show personal involvement of Sergeant McBride or Lieutenants Wright or Bergeson in the alleged violations of his rights by other defendants.  *See Ampratwum v. City of New York*, No. 11-cv-6111, 2013 WL 1935321, at *6 (S.D.N.Y. May 9, 2013) (dismissing claims on the ground of lack of personal involvement against police supervisors who were listed as defendants only because their names appeared on a number of police reports).  I grant the New London

defendants' motion for summary judgment with respect to the claims against Sergeant McBride

and Lieutenants Wright and Bergeson.

### D.        Assault and Battery – Feb. 5, 2011

Under Connecticut law, "assault" occurs when one intentionally places another in

apprehension of bodily harm; and "battery" occurs when one intentionally causes harmful or

offensive contact with another.  *Alteiri v. Colasso*, 168 Conn. 329, 334 & n.3 (1975).  "To

prevail on a claim for assault and battery, plaintiff must establish that a defendant applied force

or violence to him and that the application of such force or violence was unlawful."  *Odom v.*

*Matteo,* 772 F. Supp. 2d 377, 395 (D. Conn. 2011) (quoting *Williams v. Lopes*, 64 F. Supp. 2d

37, 47 (D. Conn. 1999)); *see also Betancourt v. Slavin*, 676 F. Supp. 2d 71, 80 (D. Conn. 2009).

The Second Circuit has recognized that state claims for assault and battery and section

1983 claims for excessive force are essentially the same, with the exception that a plaintiff must

prove that the defendant acted under color of law to succeed on a section 1983 excessive force

claim.  *See Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991).  Because I have already held that

the force used by the defendants in performing the strip search on February 5, 2011 was not

excessive or unreasonable, I also grant their motions for summary judgment with respect to

Tyus's assault and battery claims arising out of the same conduct.

### E.        Connecticut Constitutional Claims

Tyus alleges that Lieutenant Wright, Sergeant Christina, and Officers Newton and Lynch

violated his right under article I, section 7 of the Connecticut Constitution, and that all of the

defendants (except the City of New London) violated his rights under article I, section 9 of the

Connecticut Constitution.  *See* Am. Compl., Doc. No. 51, at ¶¶ 89 & 91. Article 1, section 7

provides that "people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affidavit."  Conn. Const. art. 1, § 7.  Article 1, section 9 provides that [n]o person shall be arrested, detained or punished, except in cases clearly warranted by law."  Conn. Const. art. 1, § 9.

In *Binette v. Sabo*, 244 Conn. 23, 25–26 (1998), the Connecticut Supreme Court relied on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to recognize a private cause of action for monetary damages against municipal police officers for violations of article I, sections 7 and 9 of the Connecticut Constitution that arose out of an alleged unreasonable search and seizure and unlawful arrest of the plaintiff.  The defendants argue that the Connecticut Appellate Court has limited the private right of action under those sections to circumstances involving egregious violations.  *See Martin v. Brady*, 64 Conn. App. 433, 441 (2001) (holding allegations that police pushed plaintiff to ground and smashed windows and doors did not constitute egregious conduct and, therefore, failed to state a claim under article I, sections 7 and 9 of the Connecticut Constitution), *aff'd*, 261 Conn. 372 (2002).  I agree with the defendants' interpretation, and hold that the circumstances and the claimed injuries to Tyus in connection with the alleged illegal searches and seizures are not sufficiently egregious to violate article I, sections 7 or 9.  As a result, I grant the defendants' motions for summary judgment with respect to the claims under the Connecticut Constitution.

### F.       Claims Against the City of New London

The City of New London argues that Tyus has not produced any evidence that his

constitutional rights were violated due to its failure to train employees of the New London Police

Department.  New London Defs.' Mem. Supp. Mot. Summ. J., Doc. No. 97-1, at 48.  In order to

impose liability on a municipal entity under section 1983 for a violation of constitutional rights, a

plaintiff must show that the violation was caused by a municipal policy or custom.  *See Monell v.*

*N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Municipal policies include, for instance,

"the decisions of a government's lawmakers, the acts of its policymaking officials, and practices

so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563

U.S. 51, 61 (2011).  A municipality cannot, however, be held liable "solely because it employs a

tortfeasor—or in other words . . . on a respondeat superior theory."  *Monell*, 436 U.S. at 691.

Rather, municipal liability may be established only if the plaintiff can "demonstrate that, through

its deliberate conduct, the municipality was the moving force behind the alleged injury" or that

"action pursuant to official municipal policy or custom caused the alleged constitutional injury."

*Cash v. Cnty of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks and citations

omitted).

      "A municipal policy may be pronounced or tacit and reflected in either action or inaction.

In the latter respect, a city's policy of inaction in light of notice that its program will cause

constitutional violations is the functional equivalent of a decision by the city itself to violate the

Constitution."  *Id.* at 334 (internal quotation marks and citation omitted).  Thus, a plaintiff may

"establish municipal liability by showing that a municipal policy or custom existed as a result of

the municipality's deliberate indifference to the violation of constitutional rights, either by

inadequate training or supervision."  *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 107 (D.

Conn. 2004).  But liability based on a failure to train is the most tenuous form of municipal

liability under *Monell*. *See Cash*, 654 F.3d at 336 (quoting *Connick*, 563 U.S. at 61).  To state a claim under section 1983, "a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of person with whom the untrained employees come into contact.  Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under section 1983."  *Connick*, 563 U.S. at 61 (citing *Canton v. Harris*, 489 U.S. 378, 388-89 (1989) (internal quotation marks omitted)).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Id.* at 62 (quoting *Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).  The most important consideration, however, is "whether the facts demonstrate the policymaker's failure to train or supervise was the result of a 'conscious choice' rather than mere negligence."  *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) (quoting *Canton*, 489 U.S. at 389). When a case reaches the summary judgment stage, "plaintiff must identify a specific deficiency in the city's training program and establish that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation."  *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks and citation omitted).

Tyus's allegations regarding the City's failure to train consist of conclusory allegations that the City and some of its police supervisors failed to train other police employees.  Am. Compl., Doc. No. 51, at ¶ 93.  Tyus has not pointed to any particular deficiencies in the City's training program that caused the constitutional violations.  He has offered only generalized allegations that officers lacked sufficient training regarding the appropriate method for conducting pat-down and strip searches.  Furthermore, Tyus's allegations about other incidents

involving misconduct by New London police officers are not similar to the misconduct that he alleges the defendant officers engaged in.  I hold that those incidents would not have put the City on notice of a particular area of deficiency that needed to be addressed through officer training. *See Connick*, 563 U.S. at 62.  Because Tyus did not identify particular deficiencies in the City's training program or how a particular deficiency is closely related to the alleged violations of his constitutional rights, I conclude his allegations against the City of New London that are premised on a failure to train theory do not state a claim of municipal liability.  I grant the New London defendants' motion for summary judgment with respect to Tyus's *Monell* claims.

### G.      Claims Under the Fourteenth Amendment Equal Protection Clause

Finally, Tyus generally asserts that the defendants violated his right to equal protection of the laws.  Am. Compl., Doc. No. 51, at ¶ 84.  The Supreme Court has recognized that "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  In order to prove a violation of the Equal Protection Clause, a plaintiff must demonstrate evidence of "purposeful discrimination . . . directed at an identifiable or suspect class."  *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations omitted).  Hence, to prevail on an equal protection claim, a plaintiff must allege that (1) compared with others similarly situated he or she was treated differently; and (2) that such different treatment was based on impermissible considerations such as race, national origin, religion or some other protected right.  *See Colantuono v. Hockeborn*, 801 F. Supp. 2d 110, 118 (W.D.N.Y. 2011)

(citation omitted).  A plaintiff may also state a violation of the Equal Protection Clause under a "class of one" theory.  To succeed on such a claim, a plaintiff must allege that "she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Tyus does not support his claim that he was treated differently than other similarly situated individuals.  Nor does he allege that the defendants subjected him to traffic stops, pat downs or arrests because of his membership in a protected class.  Thus, I find that he has failed to allege facts to support a plausible equal protection claim against the defendants.  I grant the defendants' motions for summary judgment with respect to Tyus's equal protection claims.  *See* 28 U.S.C. § 1915A(b)(1).

## IV.    Conclusion

Officer Newton's Motion for Summary Judgment [**Doc. No. 96**] is **GRANTED** with respect to the Fourteenth Amendment equal protection claim; the Fourth Amendment false arrest and excessive force claims; the Fourth Amendment February 5, 2011 traffic stop claim; the February 5, 2011 strip search claim; the March 3, 2011 strip search claim; the state law assault and battery claims; and the claims under article I, sections 7 and 9 of the Connecticut Constitution.  Officer Newton's motion is **DENIED** with respect to the Fourth Amendment search and seizure claims related to the January 22, 2011 traffic stop; and the Fourth Amendment search claims related to the February 5, 2011 search incident to the traffic stop.  The Fourth Amendment claim related to the search at the scene of the March 3, 2011 traffic stop also will proceed against Officer Newton, because he did not address that claim in his motion for

summary judgment.

The New London Defendants' Motion for Summary Judgment [**Doc. No. 97**] is **GRANTED** with respect to the Fourteenth Amendment equal protection claim; the Fourth Amendment false arrest and excessive force claims; the Fourth Amendment February 5, 2011 strip search claim; the March 3, 2011 search incident to arrest claim; the March 3, 2011 strip search claim; the claims against the City of New London; all claims against Sergeant McBride, Lieutenant Bergeson, and Lieutenant Wright; the state law assault and battery claims; and the claims under article I, sections 7 and 9 of the Connecticut Constitution. The motion is **DENIED** with respect to the Fourth Amendment search and seizure claims related to the January 18, 2011 traffic stop against Officers Lamonagne and Henderson; the Fourth Amendment search and seizure claims related to the January 22, 2011 traffic stop against Officer Henderson; and the Fourth Amendment search claims related to the February 5, 2011 traffic stop against Officers Lynch, Pelchat, and Marcaccio. The Fifth Amendment due process claim against the ATF defendants and the Fifth and Fourteenth Amendment due process claims against all other defendants are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Thus, all claims against defendants City of New London, Sergeant Christina, Sergeant McBride, Lieutenant Wright, Lieutenant Bergeson, Officer Schafranski, and Officer O'Mara have now been dismissed, and those defendants are terminated from the case.

It appearing to the Court that proper and effective litigation of this case cannot be achieved without appointment of counsel, the Motion for Appointment of Counsel [**Doc. No. 100**] is **GRANTED**. The Clerk's office shall make reasonable efforts to appoint counsel from the Civil Pro Bono Panel to represent Tyus.

SO ORDERED this 18th day of October 2016, at Bridgeport, Connecticut.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge